## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

BREC TODD, an individual, )
resident of McIntosh County, )
Oklahoma, )
                     )
         Plaintiff, )
                     )
v.                    )     Case No. CIV-10-085-KEW
                     )
C P KELCO GROUP DISABILITY )
INCOME INSURANCE PLAN and )
HARTFORD LIFE & ACCIDENT )
INSURANCE COMPANY, )
                     )
         Defendants. )

## OPINION AND ORDER

    This matter comes before the Court on the briefs submitted by the parties for the Court to review the merits of the decision by Defendants to deny Plaintiff's claim for disability benefits under an ERISA qualified plan. Upon review and consideration of these documents, this Court renders this ruling.

    Plaintiff, a resident of Checotah, Oklahoma, was employed by the C P Kelco as an electrician from October 16, 1999 to October of 2005. Plaintiff's position required him to regularly lift and carry 25 to 50 pounds and to apply up to 100 pounds of torque to disassemble mechanical units. (AR at 798).As a benefit of that employment, Plaintiff was eligible to participate in a long-term disability plan, identified as the C P Kelco Group Disability Income Insurance Plan (the "Plan"). The Plan was funded through the purchase of a group long-term disability insurance policy (the "Policy") from Defendant Hartford Life & Accident Insurance Company

("Hartford"), which also acted as a claims administrator.

Hartford, as claims administrator, is "delegated sole discretionary authority . . . to determine [the claimant's] eligibility for benefits and to interpret the terms and provisions of the plan and any policy issue in connection with it" by the Policy. Under the Policy, a participant is required to meet the definition of an "Occupation Qualifier" or "Earnings Qualifier" in order to be "Disabled" or suffer from a "Disability." (AR at 26).

The term "Occupation Qualifier" as used in the Policy and reflected in the Certificate of Insurance given to employees qualified under the Plan provides,

> *Disability* means that during the *Elimination Period* and the following 24 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> > 1) continuously unable to perform the *Material and Substantial Duties* of Your *Regular Occupation*; and
> >
> > 2) not *Gainfully Employed*.
>
> After the *LTD Monthly Benefits* has been payable for 24 months, *Disability* means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> > 1) continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and
> >
> > 2) not *Gainfully Employed*.

(AR at 12)(Italics in original).

The term "Earnings Qualifier" as used in the policy provides:

> *You* may be considered *Disabled* during and after the
> *Elimination Period* in any month in which *You* are
> *Gainfully Employed*, if an *Injury* or *Sickness* is causing
> physical or mental impairment to such a degree of
> severity that *You* are unable to earn more than 80% of
> *Your Monthly Earnings* in any occupation for which *You* are
> qualified by education, training or experience. On each
> anniversary of *Your Disability*, *We* will increase the
> *Monthly Earnings* by the lesser of the current annual
> percentage increase in the *CPI-W*, or 10%.
>
> *You* are not considered to be *Disabled* if *You* are able to
> earn more than 80% of *Your Monthly Earnings*. Salary,
> wages, partnership or proprietorship draw, commissions,
> bonuses, or similar pay, and any other income *You* receive
> or are entitled to receive will be included. Sick pay
> and salary continuance payments will not be included.
> Any lump sum payment will be prorated, based on the time
> over which it accrued or the period for which it was
> paid.

(AR at 12)(Italics in original.)

The Certificate of Insurance also provides the particular information required for the submission of Proof of Disability. With regard to the employee's continuing responsibility to maintain the payment of benefits, the Certificate of Insurance also states that

> *You* may be asked to submit proof that *You* continue to be
> *Disabled* and are continuing to receive *Appropriate and
> Regular Care* of a *Doctor*. Requests of this nature will
> only be as often as reasonably necessary. If so, this
> will be at *Your* expense and must be received within 30
> days of *Our* request, or as soon as reasonably possible.

(AR at 23)(Italics in original).

On October 28, 2005, Plaintiff experienced a dissection of his ascending aorta. On that date, Plaintiff underwent surgery to

repair the aorta by Dr. Charles M. Berry.

On November 1, 2005, Plaintiff submitted a completed Short Term/Long Term Disability Claim to Hartford. Dr. Berry reported that it was "undetermined" as to whether Plaintiff could return to work. Plaintiff was still in the hospital at the time the claim was submitted. Dr. Berry listed Plaintiff's treatment as "ongoing." (AR at 798-800).

On January 7, 2006, Dr. Berry completed a Medical Assessment Tool form on Plaintiff. Dr. Berry indicated he had performed an ascending aorta graft on Plaintiff to repair the Type A aortic dissection. He imposed the restriction of no lifting over 20 pounds for 3 months post surgery. Dr. Berry recommended that Plaintiff receive a CT in June of 2006. He found Plaintiff to be "slightly tremulous and not back to full work capacity at this time. Return 3-20-06."

On March 4, 2006, Hartford notified Plaintiff that he was eligible for short term disability benefits through April 30, 2006. Hartford paid these benefits, noting "[w]e will continue to assess your medical condition for improvements and return to work opportunities and will notify you if there are any changes to your short term disability approval status." Hartford also informed Plaintiff that "[s]hould your Short Term Disability claim continue to be supported beyond the maximum period payable . . . , that claim will be processed according to the provisions of the Long

Term Disability (LTD) policy." (AR at 795).

On March 14, 2006, Plaintiff submitted a Long Term Disability Income Benefits Questionnaire to Hartford. Plaintiff indicated he could independently perform activities of daily living including bathe, dress, toilet, transfer from bed to chair, voluntary bladder and bowel control or ability to maintain a reasonable level of personal hygiene, and feed himself with food that has been prepared and made available to him. (AR at 780-86).

On March 20, 2006, Dr. Berry completed an Attending Physician's Statement of Continued Disability on a Hartford form. Dr. Berry indicated Plaintiff was restricted in "no heavy lifting > 50#" and "no straining" in pushing and pulling with the same weight restrictions. He found no limitations in standing, walking, sitting, and reaching/working overhead. He also determined Plaintiff could drive and engage in keyboard use/repetitive hand motion. Dr. Berry concluded that Plaintiff's lifting/straining restrictions were "indefinite <-> permanent." (AR at 750-51).

On March 27, 2006, Dr. Berry sent correspondence to Hartford reiterating Plaintiff's condition, stating "he has an abnormal aorta from the transverse aortic arch throughout the entire length of the aorta." The condition "will require that he not perform heavy lifting or straining on a permanent basis." Dr. Berry stated that the condition left Plaintiff at a higher risk for further surgery and a "repeat dissection, aortic leakage, bleeding, etc."

Dr. Berry concluded that he "would consider [Plaintiff] permanently disabled, although he could perform desk duties and normal duties but not of a heavy physical nature." (AR at 42).

On April 4, 2006, Hartford sent correspondence to Dr. Berry. Shannon Taylor, an examiner for Hartford, requested that Dr. Berry (1) clarify how often Plaintiff would be able to lift 50 pounds (frequently, occasionally, constantly); (2) clarify if there were any restrictions/limitations to frequent stair climbing and, if so, to indicate how often Plaintiff would be able to climb more than one flight of stairs per day or indicate frequency (frequently, occasionally, constantly); and (3) state whether Plaintiff would be restricted from applying up to 100 pounds of torque to disassemble mechanical units, with a request to indicate frequency (frequently, occasionally, constantly). (AR at 747). On April 10, 2006, Dr. Berry returned the same letter sent by Hartford underlining that Plaintiff could occasionally lift 50 pounds, frequently climb stairs, and occasionally apply up to 100 pounds of torque to disassemble mechanical units. (AR at 745).

On April 28, 2006, Hartford sent correspondence to Plaintiff indicating that his claim for Long Term Disability (LTD) benefits was approved. Hartford set forth the definitions of disability under the policy and that the definition would change after LTD Monthly Benefits were payable for 24 months. The letter also set out the calculation for his LTD benefits. (AR at 738-41).

Hartford also informs Plaintiff to "[p]lease apply for Social Security Disability Benefits if you have not already done so. When the Social Security Administration makes a decision please send us copies of the award certificates or denial letters for yourself and any dependents." (AR at 740).

On October 24, 2006, November 13, 2006, and December 4, 2006, Hartford sent correspondence to Plaintiff requesting that he complete a Claimant Questionnaire and Authorization to Disclose Health Information form. The letters also requested that Plaintiff obtain a completed Attending Physician's Statement and Physical Capacities Evaluation Form from his physician. Hartford also requested information regarding the status of Plaintiff's claim for Social Security Disability benefits. Plaintiff did not respond to any of the requests. In the final letter dated December 4, 2006, Hartford stated that "[t]his will be our last request for the information needed to decide your Long Term Disability (LTD) claim. Your claim decision will be based on information presently in your file if more information is not received. This may result in termination of your claim." (AR at 718-23).

On December 26, 2006, Hartford sent correspondence to Plaintiff informing him that his Long Term Disability benefits were being terminated. The decision was based upon "policy language," "based upon a lack of sufficient Proof of Loss required to enable [Hartford] to evaluate [Plaintiff's] Disability." Hartford

specifically cited to the three written attempts to obtain further information from Plaintiff which went unanswered as "hinder[ing] our ability to determine whether you continue to satisfy the provisions of the LTD policy beyond 12/18/2006." (AR at 714-17).

Thereafter, Plaintiff submitted certain documentation to Hartford. Plaintiff sent Hartford an Attending Physician's Statement of Continued Disability dated November 8, 2006 indicating Plaintiff was treated by Dr. Richard Irvin. The Statement, however, is completed and signed by Dr. David Smith. Dr. Smith indicated Plaintiff's progress was "improved." He further found no limitation in the areas of standing, walking, sitting, reaching/working overhead, driving, and engaging in keyboard use/repetitive hand motion. Dr. Smith determined Plaintiff was restricted in lifting/carrying and straining from pulling and pushing to no more than 50 pounds. Dr. Smith also indicated Plaintiff's limitations were indefinite in duration. (AR at 694-95).

Dr. Smith also completed a Physical Capacities Evaluation Form dated November 8, 2006. The form indicates Plaintiff could occasionally lift/carry/push/pull up to 50 pounds, sit for 8 hours, stand for 2-4 hours, and walk for 1-2 hours per day and at a time. Dr. Smith also estimated Plaintiff could never climb, balance, stoop, kneel crouch or crawl, frequently drive and reach at waist level, and handle. He could occasionally reach above shoulder

height and below waist height and could occasionally finger. Plaintiff was found to be able to constantly feel with both hands. Dr. Smith placed a restriction from extreme heat on Plaintiff. (AR at 696-97).

Plaintiff also included in his submission to Hartford a denial letter from the Social Security Administration, finding Plaintiff to not be disabled and eligible for Social Security benefits. The letter is dated August 2, 2006. (AR at 698-702).

On December 29, 2006, Hartford sent correspondence to Plaintiff requesting his cardiologist to complete a Physical Capacities Evaluation Form. Hartford requested the information by January 19, 2007. (AR at 688).

On December 13, 2006, Plaintiff submitted a Physical Capacities Evaluation Form completed by Dr. Richard L. Irvin. Dr. Irvin indicated Plaintiff could sit for 8 hours per day and at a time, could stand for 8 hours per day and 2 hours at a time, and could walk for 1 hour per day and 30 minutes at a time. He also found Plaintiff could occasionally lift up to 10 pounds, frequently pull 11-20 pounds, constantly push 21-50 pounds, and never lift/carry/push/pull over 50 pounds. Dr. Irvin determined Plaintiff could occasionally drive, climb, balance, kneel, crouch, and crawl and constantly stoop, reach, handle, finger, and feel. Dr. Irvin imposed no environmental restrictions on Plaintiff. (AR at 686-87).

On August 27, 2007, Hartford performed an Assessment of Employability analysis of Plaintiff, considering the limitations imposed by Dr. Berry and Dr. Irvin. The Assessment concluded Plaintiff possessed the skills required to perform alternative sedentary, semi-skilled and skilled occupations, including the jobs of Estimator, Reviewing Officer - Driver's License, Extension Clerk - Utilities, Relay Record Clerk - Utilities, Material Lister, Assignment Clerk, Maintenance Scheduler, and Repair Order Clerk. (AR at 630-32).

On November 5, 2007, Hartford sent Plaintiff correspondence indicating the definition of disability under which his disability claim would be evaluated would change effective April 27, 2008 in accordance with the Policy. The letter also informed Plaintiff that Hartford was initiating an investigation to determined whether he met this new definition. (AR at 626-27).

On January 31, 2008, Hartford received a Functional Capacities form completed by Dr. Jonelle Gaddis on Plaintiff. Dr. Gaddis found Plaintiff could occasionally lift/carry up to 10 pounds but never more weight. She also determined Plaintiff could never bend at the waist, kneel, or crouch and could occasionally drive. Dr. Gaddis also found Plaintiff suffered from blurry vision, anxiety, and depression. She also concluded Plaintiff could "never" participate in vocational rehabilitation services. (AR at 608).

On April 2, 2008, Plaintiff was found to be disabled by the

Social Security Administration by an Administrative Law Judge and was approved to receive disability benefits. (AR at 600-04). By letter dated May 22, 2008, Plaintiff was informed by Hartford that his LTD benefit was subject to reduction by SSD benefits. Plaintiff was required to repay the overpayment of LTD benefits from his SSD benefits to Hartford as well as agreeing to pay an additional amount over the next 24 months to cover the amount of overpayment. (AR at 519-21).

On April 24, 2008, Hartford sent Plaintiff correspondence indicating it had conducted a "thorough review of all medical and vocational information in your claim file." Hartford determined Plaintiff met the new definition of disability under the Policy and approved him to continue to receive LTD benefits. (AR at 571-72).

On February 3, 2009, Hartford requested additional information on Plaintiff's status. (AR at 509). Plaintiff indicated no change in his condition in the last 18 months. (AR at 499).

On March 24, 2009, Dr. Irvin completed a Physical Capacities Evaluation Form on Plaintiff. He found Plaintiff could sit, stand, and walk 8 hours in a day and at a time. He also determined Plaintiff could occasionally lift/carry/push/pull up to 10 pounds but never more. Dr. Irvin found Plaintiff could occasionally drive, climb, balance, stoop, kneel, crouch, and crawl. He also indicated Plaintiff could constantly reach, handle, finger, and feel. Dr. Irvin did not impose any environmental restrictions. He

11

also reiterated Plaintiff was "unable to lift more than 10 pounds."
(AR at 336-37).

On March 26, 2009, Dr. Gaddis completed an Attending
Physician's Statement of Continued Disability form on Plaintiff.
She indicated Plaintiff's current primary diagnosis was thoracic
aortic aneurysm for which he was receiving medication from Dr.
Irvin. Dr. Gaddis found Plaintiff could sit for 3 hours per day
for one hour at a time, stand one hour per day for 30 minutes at a
time, and walk for one hour per day for 10 minutes at a time. She
determined Plaintiff could occasionally lift/carry up to 10 pounds
but no more. She found Plaintiff could never bend at the waist,
kneel, or crouch. Plaintiff was also found to be able to
occasionally drive, reach, and finger. Dr. Gaddis indicated
Plaintiff had "graying of vision at times" and had trouble
concentrating and remembering things. She, again, stated Plaintiff
could never participate in vocational rehabilitation services. (AR
at 469-70).

On June 2, 2009, Hartford sent correspondence to Dr. Gaddis by
facsimile, requesting additional information on her opinions,
noting they were in conflict with Dr. Irvin's opinion. Hartford
stated, "We are attempting to clarify Mr. Todd's restrictions and
limitations. Given that Dr. Irvin is Mr. Todd's treating
cardiologist for the thoracic aortic aneurysm, do you concur with
Dr. Irvin's restrictions and limitations?" Dr. Gaddis indicated

she did not agree with Dr. Irvin. The letter requested that if she did not agree, that she provide medical evidence to support her opinion. Dr. Gaddis stated "I do not agree. I have supplied my office notes already and that is all I am sending." (AR at 322-23).

Dr. Gaddis' notes indicate Plaintiff suffers from esophogeal reflux-GERD, hyperlipedimia other/unspecified, hypertension-benign, and ASHD atherosclerosis unspecified vessel. The conditions were addressed with medication and were either "Controlled" or "Fair Control" in the notes from March 4 and 26, 2009. (AR at 440-48).

On June 9, 2009, Hartford completed an Employability Analysis Report on Plaintiff. The analysis concluded Plaintiff could perform the occupation of "Specification Writer, Sedentary." Hartford employed a computerized job matching system known as OASYS to perform the analysis. (AR at 272-73).

On June 18, 2009, Hartford sent correspondence to Plaintiff informing him that he no longer met the definition for disability under the Policy. Hartford set forth the latest medical information and treatment records from Plaintiff's various physicians. Hartford noted the disagreement between Drs. Irvin and Gaddis but determined Dr. Irvin as Plaintiff's cardiologist was the more appropriate doctor to assess Plaintiff's cardiac function since his disability was cardiac related. Hartford determined that Dr. Irvin had found Plaintiff "had not symptoms attributable to the

13

aneurysm, no symptoms suggesting angina, your condition was stable, and he cleared you for bladder surgery. . . ."  (AR at 246).

Hartford also referenced its Assessment of Employability findings.  The letter concluded that "we find no evidence to support physical impairments of such a degree of severity that they would continuously prevent you from engaging in the alternative indicated above [Specification Writer] based on your education, training, and experience.  Please be advised that your file has been closed and no further benefits are payable beyond the date of this letter."  (AR at 242-47)(Bracketed information added by this Court).

On August 27, 2009, Plaintiff appealed Hartford's decision to terminate long term disability benefits.  His letter states that he physical condition had not changed since Hartford had found that he met the definition for disability under the Policy.  He stated that a "misunderstanding" with Dr. Irvin's documentation may have led to the change in status.  Plaintiff also noted several facts in the denial letter were incorrect.  Namely, the date Dr. Gaddis began attending Plaintiff, that his symptoms were not attributable to his aneurysm, and that he drives his daughter to and from school.  (AR at 237).

Plaintiff included letters from Dr. Irvin and Dr. Gaddis with his appeal letter.  In his letter, Dr. Irvin states he re-evaluated Plaintiff on August 24, 2009 and found his aortic dissection was

"unchanged from previously." He acknowledged Plaintiff's main complaint was fatigue and that he was unable to stay awake and function for 2-3 hours after taking his medication. Dr. Irvin also stated that Plaintiff will be required to remain on the medications for his life to prevent further progression of his aortic dissection and no other medications to control his blood pressure were available to keep him from being fatigued. He concluded that "[b]ecause of this, I feel that he will not be able to work even a desk job and need to be 100% disabled." (AR at 238).

The letter from Dr. Gaddis stated that Hartford's finding as to the date of first treatment by Dr. Gaddis was incorrect. She also stated that Plaintiff had several complaints of chest pain and a nuclear stress test indicating posterior wall reversible ischemia. Dr. Gaddis indicates Dr. Irvin only saw Plaintiff once per year and spent a few minutes with him at each visit. She establishes herself as Plaintiff's primary care physician and had spoken with Plaintiff about his shortness of breath and chest pain. Dr. Gaddis also noted Plaintiff's elevated blood pressure. She stated "I am only trying to keep the patient safe and alive." Dr. Gaddis acknowledges Dr. Irvin's restriction to only 10 pounds lifting "so that does limit what he can do for daily activities and for any employment. The medication he takes daily would not allow him to function for 8 hours." (AR at 239).

On September 21, 2009, Hartford requested a Medical Consultant

from an independent source, MES Solutions as a part of the review on appeal. Hartford indicated Plaintiff's diagnosis was "aorta dissection, ascending aortic replacement & aortic valve repair." It also listed Plaintiff's primary attending physician as Dr. Irvin and "other treating physician" as Dr. Gaddis, providing both their addresses and telephone numbers. As a part of the referral, Hartford requested that MES Solution to (1) "Please review the medical information, contact Dr. Gaddis and Dr. Irvin to clarify Mr. Todd's medical situation and functionality, then provide your opinion of his work capacity as of 6/19/09 in terms of Dept of Labor work category, if any, and from that date to present if the condition has changed significantly. Please include any appropriate restrictions"; (2) "Based on the medical information provided, are you in agreement with the functional abilities, restrictions and limitations provided by Dr. Gaddis and Dr. Irvin? If not, please explain"; and (3) "Please also indicate if there would be any restrictions and limitations due to the medication Clmt. is taking as of 6/19/09 and ongoing."

On October 15, 2009, Dr. Mark H. Eaton, a Board Certified physician in Internal Medicine with a Specialty Certificate in Cardiovascular Disease, authored a Peer Review Report on Plaintiff's condition for MES Solutions. Dr. Eaton contacted Dr. Gaddis' office on October 9, 2009 but was told Dr. Gaddis declined to make any statement regarding Plaintiff's disability status and

deferred to Dr. Irvin. He also contacted Dr. Irvin's office on October 8, 2009 and was told he was out of the office until October 12, 2009. On October 12, 2009, Dr. Eaton spoke with Dr. Irvin who indicated Plaintiff was "unable to work even at a sedentary level secondary to the fact that his anti-hypertensive agents (high-dose Clonidine) result in severe fatigue and lethargy."

Dr. Eaton also reviewed Plaintiff's medical records noting his visits to Dr. Irvin and Dr. Berry but finding episodes of chest pain were "fleeting" and that a CT thoracic aortography from February 11, 2009 indicated a stable aortic dissection extending from the brachlocephalic artery to the level of the right external iliac artery.

In answering the three inquiries posed by Hartford, Dr. Eaton found (1) Plaintiff would be capable of full-time sedentary level work. Plaintiff's "self-reported symptoms seem out of proportion to the clinical records reviewed." (2) He was not in agreement with the level of functional abilities, restrictions, and limitations provided by Dr. Gaddis and Dr. Irvin. While Dr. Eaton acknowledged that certain anti-hypertensive agents can result in some degree of somnolence, he concluded that this condition would not result in an inability to perform sedentary work secondary to the agents' resulting severe fatigue. (3) Based upon Dr. Irvin's concern of fatigue from the anti-hypertensive agents, Plaintiff should avoid working at heights, near water, with high voltage or

open circuit electricity, with unprotected machinery, on or near moving vehicles, with chemicals, near sources of extreme heat or in isolated places. Dr. Eaton also certified that he has no relationship or affiliation with the beneficiary of his independent review. (AR at 230-32).

MES Solutions was paid by Hartford for Dr. Eaton's report. (AR at 229).

On October 16, 2009, Hartford informed Plaintiff that it had reviewed the evidence on appeal and determined Plaintiff was not disabled as defined by the Policy. It concluded that "based on the totality of the information presented, that included our independent review of the medical records received to date, our self-reported symptoms, the report from Dr. Eaton, whose opinion and expertise we further relied on, a review by the Rehabilitation Case Manager and the policy provisions, Appeals finds the prior decision of 6/19/09 to be accurate and no further benefits are payable beyond 6/18/09." (AR at 135-37).

On March 12, 2010, Plaintiff commenced this action for judicial review under ERISA. By Opinion and Order dated March 1, 2011, this Court granted Plaintiff's request to conduct discovery in this case but limited the extent and scope of discovery "solely on Hartford's conflict of interest in the specific administration of Plaintiff's claim of benefits . . . ." The parties were afforded the opportunity to provide this Court with "any extra-

record evidence concerning Hartford's conflict of interest . . ."
This Court received no such evidence by the dates specified in the
Opinion and Order.

## I.  Standard of Review

The parties appear to be in agreement that the Plan and the
attendant Policy encompassed by the Plan is ERISA qualified.  The
Plan in this case gave Hartford "sole discretionary authority . .
. to determine [the claimant's] eligibility for benefits and to
interpret the terms and provisions of the plan and any policy issue
in connection with it."  Typically, decisions by administrators
given this level of authority by an ERISA qualified plan would be
given considerable deference, requiring the reviewing court to
scrutinize the administrator's decision under an arbitrary and
capricious standard.  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489
U.S. 101, 109-11 (1989)(an action brought under section
1132(a)(1)(B), discretionary actions of fiduciary reviewed under
arbitrary and capricious standard); <u>Woolsey v. Marion Lab., Inc.</u>,
934 F.2d 1452, 1457 (10th Cir. 1991); <u>Pratt v. Petroleum Prod.
Management Inc. Employee Savings Plan & Trust</u>, 920 F.2d 651, 657-58
(10th Cir. 1990).  "[I]n reviewing a plan administrator's decision
under the arbitrary and capricious standard, the federal courts are
limited to the administrative record."  <u>Weber v. GE Group Life
Assurance Co.</u>, 541 F.3d 1002, 1011 (10th Cir. 2008).

As this Court previously recognized in this case, however, the

Tenth Circuit permitted discovery to produce extra-record evidence in circumstances where the administrator has a conflict of interest based upon the recent pronouncement of the United States Supreme Court in the case of <u>Metropolitan Life Ins. Co. v. Glenn</u>, 128 S.Ct. 2343 (2008). Specifically, the court recognized that when an administrator "operates under the dual role conflict of interest, the district court must always weigh the conflict of interest in its abuse of discretion analysis, but it must allocate the conflict more or less weight depending on its seriousness." <u>Murphy v. Deloitte & Touche Group Ins. Plan</u>, 619 F.3d 1151, 1157-58 (10th Cir. 2010) citing <u>Weber</u>, 541 F.3d at 1010. Discovery was permitted into the potential conflict of interest of the administrator because "a claimant may not have access to the information necessary to establish the seriousness of the conflict" and "the administrator may not be fully able to rebut a claim of conflict by showing it 'has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances.'" <u>Murphy</u>, 619 F.3d at 1158 citing <u>Glenn</u>, 128 S.Ct. at 2351.

The Tenth Circuit found the Supreme Court in <u>Glenn</u> "must have contemplated that, at least in some cases, discovery and consideration of extra-record materials may be necessary and appropriate as an administrative record is not likely to contain the details of a history of biased administration of claims. . . ."

<u>Id</u>. at 1161. The court concluded, therefore, that discovery in dual role conflict of interest cases is appropriate in some cases.

This Court permitted discovery to be conducted in this case on the nature and extent of Hartford's conflict of interest in administering Plaintiff's claim in this case. Plaintiff has failed to produce any evidence demonstrating the type of conflict of interest contemplated for the consideration of extra-record materials in this review case. As a result, this Court has limited its review and any evidence of Hartford's conflict of interest to the information contained in the administrative record provided by Hartford.

Moreover, Plaintiff makes much in his briefing about the appropriate standard in reviewing Hartford's administrative decision on his claim for benefits due to the <u>Glenn</u> decision. Previously, in conflict of interest cases, the Tenth Circuit shifted the burden to the administrator "to establish by substantial evidence that the denial of benefits was not arbitrary and capricious." <u>Fought v. Unum Life Ins. Co. of America</u>, 379 F.3d 997, 1005 (10th Cir. 2004) *cert. denied* 544 U.S. 1026 (2005). This burden shifting analysis was specifically rejected by the Supreme Court in <u>Glenn</u>, noting that it is not "necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules focus narrowly upon the evaluator/payor conflict." <u>Glenn</u>, 128 S.Ct. at 2351. The Tenth

Circuit recognized the inherent overruling of <u>Fought</u> by <u>Glenn</u> in the case of <u>Holcomb v. Unum Life Insurance Company of America</u>, 578 F.3d 1187, 1192-93 (10th Cir. 2009). Instead, the standard requires a "combination-of-factors method of review" founded in both trust and administrative law in which "judges . . . determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." <u>Id</u>. citing <u>Glenn</u>, 128 S.Ct. at 2351. The court also found in employing the reasoning in <u>Glenn</u> that "[a] conflict 'should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . .'" <u>Id</u>.

Avoiding labels to the standard applied, this Court will apply the "combination of factors" standard in reviewing Hartford's administrative decision.

## II. Evaluation of Hartford's Determination

After 24 months of receiving benefits, the unequivocal language of the Policy provides that a claimant must be continuously unable to engage in any occupation for which the claimant is or becomes qualified by education, training or experience and not be gainfully employed in order to continue to receive benefits. Hartford paid Plaintiff Short Term and Long Term

benefits under the standard required before the expiration of 24 months, continually requesting additional information in order to insure Plaintiff remained qualified for benefits under the terms of the Policy.

Hartford was presented with the divergent opinions of Plaintiff's treating physicians. Dr. Berry provided an opinion prior to the expiration of the 24 month period which indicated Plaintiff could occasionally lift 50 pounds and occasionally apply up to 100 pounds of torque with few other restrictions. Dr. Irvin's opinion provided Plaintiff could occasionally lift/carry/push/pull up to 50 pounds and could sit for up to 8 hours per day and at a time. Dr. Irvin maintained this specific opinion throughout the evaluation period. Dr. Gaddis limited Plaintiff to 10 pounds in lifting/carrying and, for the first time, identified additional problems with vision, anxiety and depression. Seemingly inconsistent with all opinions, Dr. Gaddis stated Plaintiff could "never" participate in vocational rehabilitation services.

Later, Dr. Irvin opined that Plaintiff could lift/carry/push/pull only 10 pounds but maintained Plaintiff could sit, stand, and walk for 8 hours in a day and at a time. Dr. Gaddis agreed with Dr. Irvin's weight restriction but found he could sit for only 3 hours per day and one hour at a time, stand one hour per day for 30 minutes at a time, and walk for one hour

per day for 30 minutes at a time. She again reiterated Plaintiff could not participate in vocational rehabilitation services. Upon being contacted by Hartford for further explanation, Dr. Gaddis returned a rather terse response stating she did not agree with Dr. Irvin's opinion and would not send anything further to support her findings. Her notes indicated Plaintiff's conditions which she was treating were controlled. Faced with this apparent conflict in opinion, Hartford adopted Dr. Irvin's opinion and concluded after analysis that Plaintiff no longer met the definition for disability under the Policy and could perform at least one job of sedentary work. Hartford's opinion in this regard was justified, given Plaintiff's allegedly debilitating condition which ostensibly met the definition of disability under the Policy was cardiac in nature and Dr. Irvin was the cardiologist treating Plaintiff for the condition.

On appeal, Dr. Irvin offered a letter which stated he had re-evaluated Plaintiff's condition and, because medication Plaintiff was taking caused him fatigue, he believed Plaintiff to be 100% disabled which did not even enable him to work a desk job. Dr. Gaddis' letter was largely critical of Dr. Irvin's prior assessment, concluding she was actually his primary physician and that his medication would not permit him to function for 8 hours.

Given the assortment of opinions offered by Plaintiff's treating physicians, Hartford was certainly reasonable to employ

the services of an independent reviewer. Although Plaintiff attempts to suggest some bias on the part of Dr. Eaton based upon Hartford ultimately paying the bill for his services through MES Solutions, Dr. Eaton certified that he was making the review independently of any of the affiliated parties as a board certified physician. While it is true that Dr. Eaton did not personally examine Plaintiff and restricted his review to the medical records provided by Hartford, he personally contacted Drs. Irvin and Gaddis in order to assess the foundation for their opinions. The primary contention of the treating physicians appears to be that the anti-hypertensive agents given to Plaintiff made him unable to perform even sedentary work. Dr. Eaton took this circumstance into consideration in arriving at his assessment of Plaintiff's functional limitations by placing additional restrictions on his working conditions. This Court cannot conclude that Hartford's reliance upon Dr. Eaton's opinion was unreasonable or unlawful under the circumstances. Hartford attempted to minimize its potential conflict of interest and bias by employing an independent medical reviewer. This Court will not then be critical of its reliance upon the resulting opinion when the evidence from Plaintiff's treating physicians were routinely in conflict. Moreover, "ERISA does not require plan administrators to 'accord special deference to the opinions of treating physicians,' nor does it place 'a heightened burden of explanation on administrators when

they reject a treating physician's opinion.'" <u>Rasenack ex rel.</u> <u>Tribolet v. AIG Life Ins. Co.</u>, 585 F.3d 1311, 1325 (10th Cir. 2009) citing <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 823 (2003). Hartford had a sufficient evidentiary basis for its decision and the "combination of factors", including Hartford's inherent conflict of interest, its Employability Analysis, Dr. Eaton's opinion, the conflicts between the treating physicians' opinions, and the policy language justified Hartford's conclusion.

## III. Plaintiff's Arguments in Opposition

Finding support in <u>Glenn</u>, Plaintiff contends Hartford demonstrated a conflict of interest in encouraging Plaintiff to apply for Social Security benefits then failing to accept the Social Security Administration's ultimate finding on disability. In <u>Glenn</u>, the plan administrator "encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so . . ., and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work." <u>Glenn</u>, 554 U.S. at 118. As with the lower court, the Supreme Court found this "suggested procedural unreasonableness" and a conflict of interest. <u>Id</u>.

In this case, Hartford merely reminded Plaintiff to apply for Social Security benefits and inform it of the Social Security Administration's decision on disability. At that time, Plaintiff had been approved and received Short Term Disability benefits and

had been approved for Long Term Disability benefits under the Policy definition for disability applicable to the first 24 months of receiving benefits. Reminding Plaintiff to seek Social Security benefits in order to reduce its benefit obligation under the terms of the Policy neither indicates an unreasonable conflict of interest which taints the later decisions nor binds Hartford to conform its decisions under the Policy language to the determination on disability by the Social Security Administration. Indeed, Plaintiff was initially found to not be disabled for Social Security purposes and was forced to appeal the decision, all the while receiving Long Term Disability benefits from Hartford. Hartford did not terminate benefits based upon the Social Security Administration's determination nor should it have done so.

Plaintiff also contends the review done by Dr. Eaton was not an independent medical examiner but merely a reviewer. This Court does not find Hartford's choice of a medical reviewer of the records to indicate bias or degrade the objectivity of Dr. Eaton's ultimate findings. Dr. Eaton interviewed Plaintiff's treating physicians and had the medical records available to him to assess Plaintiff's condition. This Court rejects Plaintiff's requirement that a particular type of independent medical review must be done in order to satisfy the requirements of ERISA.

Further, Plaintiff asserts Hartford's "in-house" job evaluation was tainted because of Hartford's "inherent conflict"

and the fact the identified job of "Specification Writer" was available in Tulsa, Oklahoma - some distance from Plaintiff's home in Checotah, Oklahoma. Plaintiff appears to equate this case to one seeking Social Security benefits whereby a vocational expert must be able to identify jobs which are available regionally and nationally in sufficient numbers. ERISA only requires that the plan administrator follow the language of the qualified plan. In this case, the Plan required that the participant be "unable to engage in **any** occupation" for which he is qualified. No consideration is given under the Plan's language for availability, location, or inconvenience to the participant. As a result, Hartford's job identification process was sufficient to meet the requirements of the Plan. Indeed, Defendant's decision and review as a whole was not unreasonable or unsupported by the evidence contained in the administrative record.

IT IS THEREFORE ORDERED that Hartford's decision and review denying Plaintiff disability benefits is hereby **AFFIRMED**. As a result, this action is hereby **DISMISSED**.

IT IS SO ORDERED this 30th day of April, 2012.

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE